FILED
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

MAY 1 0 2011

_____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

UNITED STATES EX REL.
THOMAS REED SIMMONS,

       Plaintiff-Relator,

       v.

MERIDIAN SURGICAL PARTNERS, LLC
MERIDIAN SURGICAL PARTNERS–FLORIDA II, LLC
MS HOLDING CO., INC.
TREASURE COAST SURGERY CENTER, LLC
TREASURE COAST SURGERY, INC.
WILLIAM BYRON
ANESTHESIA ADVANTAGE, INC.
JOHN DOE ASCs A THROUGH Z

       Defendants.

Civil Action No. 3:11 cv 439

**FILED IN CAMERA AND
UNDER SEAL**

Jury Trial Requested

---

## COMPLAINT

1.     This is a qui tam action by Plaintiff-Relator Thomas Reed Simmons ("Relator"), for himself and on behalf of the United States, to recover damages and civil penalties arising from Defendants' actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

2.     Defendants offered referring physicians remuneration intended to induce or reward referrals in violation of the Anti-Kickback Statute. Defendants offered referring physicians investment interests in an ambulatory surgical center (ASC) for nominal capital contributions.

1

For some of the referring physicians, the *annual* returns exceeded 100% of the "investment" in the ASC.

3.      In addition, Defendants offered and provided at no charge to the referring physicians valuable investment services for the physicians' private investments.

4.      As a result of such improper remuneration, Defendants submitted or caused to be submitted numerous false or fraudulent claims for payment to Federal healthcare programs based on prohibited referrals.

## JURISDICTION AND VENUE

5.      This action arises under the Federal False Claims Act, 31 U.S.C. § 3729 et seq.

6.      Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that Count I of this action arises under the laws of the United States.

7.      Venue is proper in this district under 31 U.S.C. § 3732(a). At least one of the Defendants can be found, resides, or transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

8.      The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

9.      The Relator is an "original source" as that phrase is used in the False Claims Act.

2

## THE PARTIES

**Thomas Reed Simmons -- Plaintiff Relator**

10.     Plaintiff Relator Thomas Reed Simmons ("Relator") is a resident of the state of Florida. He is the business office manager at Treasure Coast Surgery Center, LLC doing business as Treasure Coast Center for Surgery (hereinafter "Treasure Coast LLC").

11.     At the direction of defendant William Byron and with the knowledge and consent of the Meridian defendants, Relator also provides administrative support for the referring physicians' outside investments while on Treasure Coast LLC payroll.

12.     As Treasure Coast LLC's business office manager, Relator has direct and personal knowledge of the violations described below.

**Meridian Surgical Partners, LLC**

13.     Meridian Surgical Partners, LLC does business in Brentwood, TN 37027.

14.     Meridian finances, develops and operates ambulatory surgery centers and related healthcare businesses throughout the country.

15.     It owns and controls Meridian Surgical Partners–Florida II, LLC.

16.     It controls and operates Treasure Coast Surgery Center, LLC.

17.     On information and belief, it also owns majority shares of 12 or 13 ambulatory surgical centers located in Arkansas, California, Florida, Illinois, Louisiana, Montana, Nebraska, Oregon, and Pennsylvania.

**Meridian Surgical Partners–Florida II, LLC**

18.     Meridian Surgical Partners–Florida II, LLC is a Delaware limited liability corporation located at Brentwood, TN[Unknown A1] 37027 whose[Jonathan 2] sole "manager" is Meridian Surgical Partners, LLC (same address).

3

19.    Meridian Surgical Partners–Florida II, LLC was the majority owner of and manages Treasure Coast Surgery Center, LLC.

**MS Holding Co., Inc.**

20.    On information and belief, MS Holding Co., Inc. may have purchased from Meridian Surgical Partners–Florida II, LLC its majority ownership of Treasure Coast Surgery Center, LLC.

21.    The Meridian and MS Holding Co. Inc. entities are hereinafter referred to collectively as **"Meridian**."


**Treasure Coast Surgery Center, LLC**

22.    Treasure Coast Surgery Center, LLC, doing business as Treasure Coast Center for Surgery, 1411 SE Ocean Blvd., Stuart, FL 34996, (hereinafter "Treasure Coast" or "Treasure Coast LLC") is a Delaware limited liability corporation founded June 2007.

23.    As discussed more fully below, it is owned in part by referring physicians and in part (currently approximately 55%, initially 60%) by Meridian Surgical Partners–Florida II, LLC.

24.    Treasure Coast is an ambulatory surgical center ("ASC").

25.    ASCs are non-hospital facilities equipped with operating and recovery rooms where physicians perform outpatient surgeries and other procedures.

**Treasure Coast Surgery, Inc.**

26.    Treasure Coast Surgery, Inc., (hereinafter "TCS, Inc.") 1411 E. Ocean Blvd, Stuart FL is a Florida corporation operated by investor physicians who refer to Treasure Coast Surgery Center, LLC.

27.    Treasure Coast Surgery, Inc. sold 60% of its assets to Meridian, which, in turn, contributed the assets to the newly created Treasure Coast Surgery Center, LLC. The remaining tangible assets were also contributed to the LLC.

**William Byron**

28.    William Byron holds the title of "Administrator" of Treasure Coast LLC although he is not on its payroll and receives neither a W-2 nor a form1099 from it.

4

29.     Mr. Byron reports to Meridian Surgical Partners, LLC's Chief Operating Officer and also to Treasure Coast's "Board of Managers."

30.     Treasure Coast LLC pays Mr. Byron $12,500 per month through checks made out to "Health Advantage," "Health Advantage, Inc."(not a corporation), and a Florida corporation Anesthesia Advantage, Inc.

31.     Much of Mr. Byron's time is expended administering Treasure Coast's referring physician investors' investment properties, such as the "Monterey Triangle" real estate projects.

**Anesthesia Advantage, Inc.**

32.     Anesthesia Advantage, Inc. appears to be nothing more than a shell corporation for the pass-through of compensation for William Byron. It registered its principal address at 913 Thurston Dr., Palm Beach Gardens, FL 33418. Defendant Byron is the sole registered agent, sole officer, and sole director at that same address. It has no Florida healthcare license and no NPPES provider number.

33.     Mr. Byron, as the administrator of Treasure Coast, has directed that no 1099 or W-2 be issued to him, to Health Advantage, or to Anesthesia Advantage, Inc.

**John Doe ASCs A – Z**

34.     Relator understands that Meridian Surgical Partners, LLC owns more than 50% of a dozen or more ASCs.

35.     To the extent that Meridian-controlled ASCs are owned and operated in the same manner in which it owns and operates Treasure Coast, then claims filed by those ASCs would also be false under the False Claims Act.

## MEDICARE

36.     Plaintiff United States of America administers the Supplemental Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395j-1395w ("Medicare Part B Program"). The objective of the Medicare Program is to provide Medical insurance for covered services to any person 65 years or older, to certain disabled persons, and to individuals with chronic disease who elect coverage

5

under the program. The Department of Health and Human Services ("DHHS") has delegated the administration of the Medicare Program to its component agency, Centers for Medicare and Medicaid Services ("CMS").

37.     Part B of the Medicare Program is a 100% federally subsidized health insurance system for eligible persons.

38.     To participate in the Medicare Program, a provider such as Defendant Treasure Coast must file a provider agreement with the Secretary of DHHS. The agreement requires compliance with the requirements that the Secretary deems necessary for participation in the program.

39.     An Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours.

40.     An ASC, such as Treasure Coast, must have an agreement with CMS to participate as a Medicare provider, and must meet the conditions set forth in 42 C.F.R. Part 416 relating to ASCs and elsewhere at Title 42 as set forth at 42 C.F.R.

## THE FALSE CLAIMS ACT

41.     Under the Federal False Claims Act, 31 U.S.C. §3729(a) *et seq.*, any person having direct, personal knowledge about a violation of the Act may bring an action on behalf of the United States of America.

42.     A provider's failure to inform itself of the legal requirements for participation in the Medicare program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question under the False Claims Act.

6

## FEDERAL ANTI-KICKBACK STATUTE

43.     The Federal Anti-Kickback Statute (the "AKS"), Social Security Act 1128(B)(b), codified at 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from, inter alia, making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded health care program.

44.     Under this statute, health care providers may not offer or pay -- and sources of referrals may not solicit or receive -- any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any service or item that may be paid for, in whole or part, by a Federal health care program. 42 U.S.C. § 1320a-7b(b).

45.     The AKS is violated if *one* purpose of an arrangement is to induce referrals, even if other, legitimate purposes are also present.

46.     The AKS attaches liability both to the person paying the kickback and to the person receiving the kickback.

47. .   The knowing submission of a claim based on a referral precluded by the AKS constitutes a violation of the False Claims Act.

48.     Physicians are the sole referral source for Treasure Coast, and thus have the ability to direct substantial business to it.

49.     All Defendants therefore have an incentive to provide remuneration to physicians in order to induce them to refer business to Treasure Coast or to reward them for past referrals.

50.     Defendants have submitted or caused to submit, and continue to submit or cause to submit, numerous claims for payment to Medicare, Medicaid, and other federal healthcare

7

programs arising out of referrals from such physicians.

51.     The AKS contains a number of exceptions, referred to as "safe harbors," which insulate conduct that might otherwise be found to violate the statute. Among others, the AKS contains safe harbors for four categories of ambulatory surgical centers, each with slightly different requirements. See 42 C.F.R. § 1001.952(r)(1)-(4). None of the exemptions apply to insulate Defendants' activities from the Anti-Kickback Statute.

52.     Subsection 42 C.F.R. 1001.952(r) defines "remuneration" to physicians as it pertains to ambulatory surgical centers (ASCs).[Unknown A3] The exception at 1001.952(r) provides, in part:

> **(r) Ambulatory surgical centers.** As used in section 1128B of the Act, "remuneration" does not include any payment that is a return *on an investment interest,* such as a dividend or interest income, made to an *investor,* as long as the investment entity is a certified ambulatory surgical center (ASC) under part 416 of this title, whose operating and recovery room space is dedicated exclusively to the ASC, patients referred to the investment entity by an investor are fully informed of the investor's investment interest, and all of the applicable standards are met within one of the following four categories—
> [Emphasis supplied]

53.     For a multi-specialty ASC, such as Treasure Coast, the provisions at 42 C.F.R. § 1001.952(r)(3) are pertinent to whether there is a safe harbor granted with respect to remuneration paid to referring physicians.

> (3) **Multi-Specialty ASCs**—If all of the investors are physicians who are in a position to refer patients directly to the entity and perform procedures on such referred patients; group practices, as defined in this paragraph, composed exclusively of such physicians; or investors who are not employed by the entity or

8

by any investor, are not in a position to provide items or services to the entity or any of its investors, and are not in a position to make or influence referrals directly or indirectly to the entity or any of its investors, all of the following seven standards must be met—

(i) The terms on which an investment interest is offered to an investor *must not be related to the previous or expected volume of referrals*, services furnished, or the amount of business otherwise generated from that investor to the entity.

...

(v) *The amount of payment to an investor in return for the investment must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.*

...

[Emphasis supplied]

54.     Defendants fail to comply with 42 C.F.R. §1001.952(r)(3)(i) requiring that the investment not be related to "the previous or expected volume of referrals."

55.     Defendants fail to comply with 42 C.F.R. §1001.952(r)(3)(v) requiring that "payment to an investor in return for the investment must be directly proportional to the amount of the capital investment."

56.     CMS comments to the regulations anticipate Defendants' violations.

The gravamen of an anti-kickback offense is payment of remuneration to induce the referral of Federal health care program business. In the context of an ASC, *our chief concern is that a return on an investment in an ASC might be a disguised payment for referrals.* Two examples illustrate the potential problem. First, primary care *physicians could be offered an investment interest in an ASC for a nominal capital contribution as an incentive to refer patients ... .*

[Emphasis supplied]  63536 Federal Register / Vol. 64, No. 223 / Friday, November 19, 1999.

9

57.     The law is clear that the knowing submission of Medicare[Unknown A4] claims based

on referrals precluded by the AKS constitutes a violation of the False Claims Act. *See United*

*States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009), *United States v.*

*Rogan,* 459 F. Supp. 2d 692, 717-718 (N.D. Ill. 2006) ("Falsely certifying compliance with the

Anti-Kickback Statute … in a Medicare cost report is actionable under the FCA").

## THE FALSE CLAIMS

58.     Defendants filed or caused to be filed multiple claims with Medicare and other

government programs.

59.     From July 2007 to 2010, Treasure Coast filed over $31 million in Medicare claims.

60.     In 2010, for example, Treasure Coast filed 2,093 Medicare claims in the amount of

$8,770,464.

61.     These claims arise from surgical referrals from various physicians. However,

approximately three-quarters of the claims were from referrals from so-called "investors" in

Treasure Coast.

62.     In addition, the Medicare claims filed with respect to procedures performed by *investor*

physicians were significantly higher than those filed with respect to procedures performed by

non-investors.

63.     In 2009 for example, Medicare claims filed by Treasure Coast with respect to procedures

performed by Treasure Coast's 14 investor physicians were 290% higher than the Medicare

claims filed with respect to 13 non-investor physicians. Treasure Coast's Medicare claims

averaged over $570,000 for each of the investor physicians, compared to an average $197,000

10

for the 13 non-investing physicians.

64.     Similarly, in 2010, of $8.8 million total Medicare claims, claims totaling $6.5 million arose from referring "investor" physicians.

65.     For the four years 2007 – 2010, the investor physicians generated 81% ($28.8 million out of $35.7 million) of Treasure Coast's Medicare claims.

66.     Below is a sample of Medicare claims filed or caused to be filed by Defendants.

| Service Date | Lname,[1] FI | Amt. | Physician | CPT[2] |
|---|---|---|---|---|
| 10/25/10 | Ste, S | $1,043 | Anspach | 29881 |
| 10/25/10 | Fle, L | $2,110 | Anspach | 29824 |
| 10/25/10 | Van, G | $2,924 | Anspach | 29827 |
| 10/26/10 | Ted, E | $1,646 | Suits | 50590 |
| 10/26/10 | Wre, L | $2,125 | Diaz | 25607 |
| 10/26/10 | Lan, H | $14,282 | Husted | 63685 |
| 10/26/10 | Gre, J | $17,714 | Husted | 63685 |
| 10/26/10 | Bie, H | $20,413 | Husted | 63685 |
| 10/27/10 | Don, P | $1,043 | Carlson | 29880 |
| 10/27/10 | Myl, M | $1,539 | Breslauer | 28285 |
| 10/27/10 | Eng, J | $1,829 | Breslauer | 28298 |

67.     The claims submitted to the government on behalf of patients referred by investor physicians violate the AKS and FCA statutes because the referring "investor" physicians received compensation for their referrals in the guise of corporate distributions and investment management services, all in violation of the anti-kickback statute.

---

[1]          Only the first names' initials and the first three letters of the patients' last names are displayed.
[2]          CPT (Current Procedural Terminology) codes are numbers assigned to every task and service a medical practitioner may provide to a patient including medical, surgical and diagnostic services. They are used to determine the amount of reimbursement.

11

## A. Meridian Pays for Referrals through "Investment" Distributions

68.    Defendants compensate the physician investors for referrals and characterize this compensation as distributions based on "investments" in Defendant Treasure Coast LLC.

69.    As further described below, the referring physicians' purported "investments" are made available to them by Defendants at less than 1/10 the price of Meridian's investment, thus yielding more than ten (10) times Meridian's investment return. 42 C.F.R. §1001.952(r)(3)(v).

70.    The purported "investment return" is, in fact, remuneration for patient referrals.

71.    "Remuneration" includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, subject to certain exclusions. 42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

### i. Background

72.    Treasure Coast Surgery, Inc., an ambulatory surgical center, was initially established by Robert H. Fier, M.D., who brought in other referring physicians as investors.

73.    In June 2007, Meridian Surgical Partners–Florida II, LLC (a wholly owned subsidiary of Meridian Surgical Partners) paid more than $5.5 million to the physician investors of Treasure Coast Surgery, Inc. (the Florida company owned 100% by its investor physicians).

74.    The purchase documents characterize the transaction as a purchase of 60% of an undivided portion of the company's assets.

75.    However, rather than the claimed asset purchase, Meridian's valuation was based on an eight times multiple of Treasure Coast Surgery, Inc's 2006 earnings.

76.    This earnings-based valuation included the value of the physician investors' referrals to Treasure Coast Surgery, Inc.

77.    Simultaneous with the "asset" purchase, Meridian contributed those same "assets" to a new entity, Treasure Coast Surgery Center, LLC, in exchange for a 60% ownership share and an ongoing management fee.

78.    Treasure Coast Surgery, Inc. contributed its remaining assets to the new LLC in exchange for 40% of the LLC.

79.    The price paid by Meridian for 60% of Treasure Coast values the entire entity (100%) at approximately $9.6 million and a 1% share of that would be valued at nearly $100,000.

80.    Treasure Coast Surgery, Inc.'s *entire* tangible assets at the time were worth less than $550,000.

81.    The $550,000 tangible assets included equipment, supplies, receivables (over $400,000), cash (over $300,000), payables and debts (about $300,000), etc.[Unknown A5]

82.    The difference between the value of the tangible assets it purchased, and what it paid was entered on Treasure Coast LLC's balance sheet as "intangible assets" of over five ($5) million dollars.

83.    This amount for *intangible assets* is what Meridian paid the existing physician investors for future referrals.

84.    Nine months later, in January 2008, Meridian reduced its 60% ownership by "selling" to James Hoffman, M.D. a 3% share of the company for $25,183[3]; and to Drs. Alexander Katz and Nathaniel Hill, 1% each for $8,538 in March and April 2008.

85.    On its face, these sales place a value of 1% of Treasure Coast at approximately $8,500 (average between $8,394 to $8,598) and the entire entity (100%) at $850,000, a more than a 90%

---

[3]    One third of $25,183 equals $8,394.

13

reduction from the $9.6 million value calculated from what Meridian paid fewer than nine months earlier.

86.     This apparent diminution in value cannot be attributed to a reduction in value of Meridian's investment since Treasure Coast was profitable and generating immediate cash payouts.

87.     In April 2008 (three months after his $25,183 "investment") Dr. Hoffman enjoyed his first distribution -- $4,500. In July he received another -- $3,750.

88.     Similarly, doctors Katz and Hill received their first distributions, $1,500 each, *the same month they first invested*.

89.     The proximity of the purchase and the initial distribution within the same month suggests that the actual outlay of these two doctors was not the $8,538 for 1% as shown on the company's book, but rather a *de facto* $7,038 ($8,538 – 1,500) for a 1% share.

90.     Thus, on paper Meridian incurred a substantial loss when "sold" to these doctors 1% shares for approximately $89,000 less than the approximately $96,000 it paid for 1% shares.

91.     The transactions for doctors Hoffman, Katz, and Hill are discussed below.

**ii. Meridian Paid the Original Investors for Referrals**

92.     The Anti-kickback Statute (AKS) safe harbor at section (r)(3) reserves safe-harbor status for returns on "investment interests."

93.     The following physicians owned shares of Treasure Coast <u>Inc</u>. in June 2007: Robert H. Fier, M.D., William E. Anspach, III M.D., William E. Carlson, M.D., Jack Daubert, M.D., Scott M. Desman, M.D., George Haas, M.D., David Elliott, D.O., Gary Guzzardo, M.D., Richard M. Kadingo, M.D., and Craig Breslauer, M.D.

14

94. After Meridian purchased 60% of Treasure Coast Inc.'s assets (tangible and intangible), those physicians received distributions of over $5.5 million, plus a 40% "investment interest" in the new entity, Treasure Coast LLC.

95. These referring physician investors have no money or other assets (other than their prospective referrals) invested in the LLC since they had already received over $5.5 million for tangible assets (e.g., equipment, supplies, receivables, and working capital) worth less than $500,000.

96. Thus, notwithstanding Defendants' characterization of the transaction, there is no bona fide "investment interest" in Treasure Coast.

97. Absent an "investment interest," there can be no return on investment interest.

98. A primary purpose of Meridian's $5.5 million dollar payment in June 2007 to these physicians was to induce referrals.

99. A primary purpose of Treasure Coast LLC's post-June 2007 payments to these physicians, averaging over $1,000 per month per physician, is to induce referrals.

### iii. Meridian paid Dr. Hoffman for Referrals

100. Meridian sold some of its shares to Dr. Hoffman at approximately a 90% discount from what it had paid for them months earlier.

101. In the slightly more than three years since then, through March 2011, Treasure Coast paid Dr. Hoffman $54,128 on his $25,183 "investment."

102. This double-your-money-back "investment" can only be viewed as an inducement for referrals.

15

### iv. Meridian paid Dr. Katz for Referrals

103.  Meridian sold 1% to Dr. Katz for $8,538 in April 2008.

104.  Fourteen months later, by June 2009, his distributions totaled $8,600.

105.  In June 2009, Meridian sold Dr. Katz an additional 1% (reducing its then ownership from 54.37% to 53.37%).

106.  Meridian runs Treasure Coast, determines its current revenue, projects anticipated revenue, and is in the business of administering and valuing ambulatory surgical centers.

107.  Notwithstanding its ASC expertise and financial acumen, for an additional 1%, an investment it could reasonably anticipate would generate $6,000 or $7,000 or more per year, Meridian charged Dr. Katz $8,969. This brought his total "investment" to $17,507.

108.  Dr. Katz's distribution (payment) from Treasure Coast from June 2009 through March 2011 totaled $19,148.

109.  His distribution payment since April 2008 to date has totaled $27,748.

110.  Meridian gave Dr. Katz one good deal, and then another to reward him as one of Treasure Coast's top physician referrers.

111.  Referrals from Dr. Katz keep increasing. In 2007 his Medicare referrals totaled $216,305; in 2008 they increased by nearly a hundred thousand dollars to $311,350. In 2009 his referrals increased by another hundred thousand dollars to $410,285 and last year a $200,000 increase brought his referrals to $612,093.

112.  Meridian's offered "investment" opportunities to Dr. Katz which related to his previous or expected volume of referrals. Meridian's payments to Dr. Katz are no more than disguised payment for referrals. 42 C.F.R. §1001.952(r)(3)(i).

16

**v. Meridian paid Dr. Hill for Referrals**

113.    Since "investing" $8,538 in April 2008, Dr. Hill has received distributions through January 2011 of $16,879.

114.    In February 2011, he was allowed to "purchase" an additional 1.07% share (Meridian sold .67%, and the rest came from the physician "investors", all of whom had their shares reduced pro rata). The additional 1.07% was made available to Dr. Hill for $7,408.[4]

115.    In the two months since, Dr. Hill's February and March distributions totaled $2,018.

116.    This is not a market return enjoyed by any investor in any bona fide investment. It can only be viewed as an inducement for patient referrals.

**vi. Meridian paid Dr. Breslauer for Referrals**

117.    Dr. Breslauer owned .91% Treasure Coast Inc.

118.    When Meridian paid $5.5 million for 60% of that company, Dr. Breslauer received for 60% of his .91% over $50,000, plus .37% (40% of .91%) of the new LLC.

119.    At the inception of the new LLC, he is showed initially owning .37% based on an original "contribution" of $3,300.

120.    In October 2008, Meridian sold him an additional .63% for $5,495.[5]

121.    The financial reality is that Meridian paid Dr. Breslauer over $50,000 for .54% (60% of his .91%) of an ASC and then, little more than a year later, sold it back to him (plus an additional .09%, the .63%) for $5,495.

---

[4]    A price of 7,408 for 1.07% would suggest that Meridian now values 100%, the entire company, at only $691,618 ($7,408/1.07%).

[5]    That price theoretically values a 1% share at $8,722 ($5,495/.63%).

17

122.	On its face, the 2008 Breslauer transaction caused Meridian to lose nearly $50,000 on its 2007 investment.

123.	In contrast to Meridian, Dr. Breslauer did quite well in addition to having regained an interest in an ASC that he had sold for $50,000.

124.	As an investment return, for his total "investment" of $8,795 ($3,300 + $5,495), Treasure Coast has paid $17,045 to Dr. Breslauer through March 2011.

125.	As with the other physicians, this can only be viewed as remuneration intended to induce or reward referrals.

**vii. Summary**

126.	The actuality of all these transactions is that the referring physician investors hold no bona fide *investment interests* as such term is used in the AKS (r)(3) safe harbor.

127.	Meridian causes Treasure Coast to pay these physicians for patient referrals.

128.	The nominal amounts paid by the referring physicians for shares of the company are returned immediately in the form of distributions.

129.	A primary purpose of the payments to these physicians is to induce or reward referrals.

130.	Through March 2011, Meridian earned approximately 5.4% per year on its July 2007 $5,782,433 investment.

131.	In contrast, the June 2007 referring physicians' average "investment" returns exceed 100% per year since June, 2007.

132.	The *de facto* economics of this scheme is that Meridian undervalued Treasure Coast's shares because of an arrangement whereby these "investors" would be providing the facility with valuable referrals.

133. The distributions made to the referring physicians were not returns on bona fide market value investments.

134. The payments to referring physicians are compensation for providing Treasure Coast with patient referrals on which Meridian earns a "service fee" of 6% of net collections in addition to its investment return.

135. Meridian's fee was approximately $265,000 for the 12 months ending March 31, 2011.

136. As shown by the recent (post-June 2007) investors, the so-called investment required to enter into the scheme is set low so as to induce potential referral sources.

137. However, this investment opportunity was not made available to others, who are not potential significant referral sources.

138. There are no legitimate fair market value investments in which, for example, a 1% share that generates over $6,000 per year would require an investment of only $8,000.

139. Consequently, there is no other plausible rationale for these sham "investments" other than as a subterfuge for illegal AKS remuneration.

**viii. Distributions from the So-Called Investment Require Patient Referrals.**

140. Subsection 42 C.F.R. §1001.952(r)(3)(i) requires that an AKS-exempt investment not be related to the previous or expected volume of referrals.

141. Through its sales of shares in Treasure Coast LLC and its administration of that entity to determine distributions, Meridian is in a position to influence referrals to Treasure Coast.

142. Meridian, in fact, influences referrals to Treasure Coast by making the *investment* opportunity correlate to patient referrals.

143. The referring physician investors entered into Member Purchase Agreements that

19

incorporate by reference the Operating Agreement of Treasure Coast Surgery Center, LLC. [hereinafter "Operating Agreement"].

144.    On its face, the Operating Agreement states that participation does not require referrals. Operating Agreement, paragraph 8.4 (d).

145.    However, other terms of the Operating Agreement serve as a de facto mandate for patient referrals since, as explained below, the investment opportunities are limited to local surgeons, it allows for limited competition, and it mandates that if any of a specified number of "triggering events" stops patient referrals, the shares will be purchased back and the physicians will be removed from the investment (i.e., no longer eligible for distributions).

146.    The Operating Agreement prohibits "investor" physicians ("members") from having any direct or indirect interest in or any financial interest in any competing business, including a physician office in which surgical procedures are performed, within 20 miles of Treasure Coast, until two years after the physician ceases to be a member of the company. Paragraph 8.4 (b).

147.    The sanctions for violating paragraph 8.4(b) are severe: "... Meridian, in addition to all other remedies it may have, shall have the right to injunctive relief if there is such a breach." Paragraph 8.4(f).

148.    Further, the physician's entire investment is forfeit. Paragraph 8.15(b)(iii).

149.    The Operating Agreement lists various "triggering events" all of which terminate a physician's participation (i.e., eligibility for distributions). Paragraph 8.15(a).

150.    Among the triggering events is relocation outside of Treasure Coast's "market area." Paragraph 8.15(a)(iv).

151.    The term "market area" is a euphemism for *referral* area since the market area is the area

20

from which patients are referred.

152.     The "investment" (eligibility for distributions) in Treasure Coast is not treated like a typical arms-length investment that can be assigned to others who would enjoy a market return based on the value of the investment. Rather, assignment, with approval, is limited to local physicians in the "Stuart Florida area." Paragraph 8.15(d).

153.     The "Stuart Florida area" is another euphemism for *referral* area.

154.     Other triggering events include death, disability, cessation of the practice of medicine, relocation, loss of license, 8.15(a)(i)-(vii); and, of course, loss of Medicare privileges. *See* 8.15(a)(vii) and (ix). In other words, a physician loses investor status (eligibility for distributions) through any event that has the potential to interrupt Medicare referrals.

155.     For example, through May 2010 Dr. Kadingo enjoyed $31,242 in distributions on his July 2007 "investment" of $11,807, averaging a return of approximately $1,000 a month.

156.     Dr. Kadingo had a stroke and stopped referring patients. Consequently, Meridian terminated his interest in the company.

157.     Dr. Kadingo did not voluntarily give up the $1,000 a month he earned on his $11,807 "investment."

158.     Meridian caused Treasure Coast to stop paying the $1,000 a month because the payments Dr. Kadingo received were in actuality payments for referrals—not a return on an investment.

159.     In addition, a catch-all triggering event for investor termination is "the determination by members holding the requisite majority . . . ." 8.15(a)(xiii).

160.     The phrase, "members holding the majority" is an intentionally obscure way to say "Meridian" since it, by itself, has held the majority of shares since the founding of Treasure

21

Coast LLC.

161.    Meridian can boot out any physician investor, notwithstanding the inapplicability of any of the many enumerated causes, and without any explicit or express cause whatsoever. 8.15(a)(xiii).

162.    Meridian kicked out founding physician Robert H. Fier, M.D. because he ceased making referrals.

163.    Dr. Fier had a dispute with some of the other doctors, stopped making referrals, and was subsequently kicked out.

164.    Paragraph 8.15's "triggering events" are in actuality "referral decreasing events."

### B. Meridian Compensates Physicians with Investment Management Services

165.    William J. Byron worked in an unknown capacity for the referring investor physicians before Meridian's 2007 purchase.

166.    As part of the purchase, Meridian agreed to find a "role" in the new LLC for Mr. Byron or to compensate him in the event there was no ongoing management role available.

[Unknown A6]

167.    Meridian, through Treasure Coast LLC, contracted with Mr. Byron[6] as a part-time consultant for $12,500 per month, and gave him the title of "Administrator" of Treasure Coast, although he is not on its payroll and receives neither a W-2 nor a Form 1099 from it.

168.    The consulting contract between Treasure Coast LLC and "Health Advantage, Inc., a Florida Corporation," was signed by "William Byron, president," notwithstanding there is no such Florida corporation.

_____

[6]

22

169. Mr. Byron spends little more than half a day per week on his Treasure Coast LLC responsibilities.

170. Treasure Coast LLC paid and continues to pay Mr. Byron $12,500 per month through Anesthesia Advantage, Inc. and other shell companies (Health Advantage, not incorporated).

171. The majority of this $12,500 per month inures to the direct benefit of referring physicians who enjoy free of charge the investment management services that Mr. Byron provides for their investments in their real estate projects, such as two "Monterey Triangle" projects.

172. Meridian does not have an ownership interest or benefit from these separate real estate projects.

173. Mr. Byron spends much of his time administering the physician investors' investment properties, such as the Monterey Triangle real estate projects.

174. In addition, he requires Relator and other Treasure Coast employees to work on the administration of the referring physicians Monterey Triangle real estate projects .

175. As a consequence, income that should otherwise be distributed to Meridian, as majority owner of Treasure Coast, instead benefits the referring physicians by approximately $10,000 per month.

176. Although Meridian owns over half of Treasure Coast and would be entitled to over half of the benefit of these services (in an arms-length and *bona fide* fair market value transaction), it instead established this scheme as a mechanism to further compensate referring physician investors.

177. On November 9, 2010, Relator called Susan Baker, Meridian's HR director concerning

23

Medicare compliance issues, including the issue of Mr. Byron's provision of benefits for the referring physicians' outside investments and Mr. Byron's directing Relator to provide administrative and clerical services for referring physicians' outside investments.

178.   Following Relator's inquiry, Bryan Brown, Meridian's regional vice-president, reduced Relator's compensation and also reduced his bonus with no explanation other than that the Center had to make some "adjustments."

179.   Relator then met with Kathy Kowalski, Meridian's Executive Vice-President and Chief Operating Officer, on January 10, 2011, and told her that Mr. Byron had been directing him and another employee, Diane Oprzadek, to perform administrative functions for the referring physicians' investments.

180.   He explained that under Mr. Byron's direction, he had been keeping the books for the real estate companies and that Diane Oprzadek had spent time preparing physicians' loan documents and traveling to and from their offices to obtain signatures. In addition, he explained his concern over the payments made to Anesthesia Advantage to compensate Mr. Byron, notwithstanding the lack of a fair-market value assessment of Mr. Byron's services.

181.   Ms. Kowalski told Relator that Mr. Byron's payments and services were okay with Meridian and that Relator should continue assisting with the physicians' real estate investments as directed by Mr. Byron.

### C. Meridian Pays More to the Two Top Referral Physicians

182.   On November 24, 2010, Relator was directed to begin paying Drs. Carlson and Daubert two thousand five hundred dollars ($2,500) per month each and that the payments were to be characterized as "medical director" payments.

183.   Relator has not observed any additional duties performed by either physician in their

24

purported capacities as medical directors. He has not observed any changes in their activities on behalf of Treasure Coast.

184.    The $2,500 per month is referral compensation for being top referrers.

185.     Dr. Carlson is Treasure Coast's top source of Medicare referrals, having referred $5,153,869 in the four years ending December 31, 2010.

186.    Dr. Carlson is also the managing partner for South FL Orthopedics, a group which includes referring physician/investors: Drs. Anspach, Desman, Haas, Hoffman, Hill, and Breslauer.

187.    Dr. Daubert is Treasure Coast's second highest source of Medicare referrals, having referred $4,679,861 in the four years ending December 31, 2010.

188.    Dr. Daubert owns and operates Florida Vision Institute, a medical practice which includes Treasure Coast physician/investors Dr. Katz and Dr Kadingo (until he was kicked out of Treasure Coast following his stroke).

189.    In contrast, a former investor, Dr. Guzzardo, had been Medical Director from 2005 to March, 2008 and held the title without pay.

190.    The additional $2,500 per month payments to Drs. Carlson and Daubert are additional compensation for their millions in referrals and for having brought in the other referring physicians.

### D. Estimated Damages

**All Defendants other than John Doe ASCs**

191.    From June 28, 2007 through December, 2010, Defendants filed, or caused to be filed 8,330 Medicare claims seeking reimbursement from the U.S. Treasury in an amount exceeding $31 million. Of these, approximately 3/4 of the claims were based on illegal referrals from

25

investor physicians in an amount exceeding $23 million.

192.     During 2011, Defendants filed or cause to be filed illegal claims at a rate similar to those that were filed during 2010.

193.     Relator estimates approximately $30 million in Medicare claims were based on illegal referrals from investor physicians as of the filing date of the Complaint.

194.     By falsely certifying that it had complied with the AKS and pertinent regulations when it submitted claims for reimbursement to the U.S. government, Treasure Coast, Meridian and the other defendants violated the FCA and are liable for damages.

195.     The estimated $30 million in Medicare claims based on illegal referrals from investor physicians would be the single damages amount before the imposition of mandatory FCA damages and penalties.

**Meridian and John Doe ASCs**

196.     Meridian finances, develops, and operates ambulatory surgery centers and related healthcare businesses throughout the country.

197.     To the extent Meridian employs purchase agreements, operating agreements and management services agreements similar to those it uses with Treasure Coast, and that they contain the same or similar referral-inducing provisions, then it would have caused similar false claims based on investor physician referrals to be submitted to the U.S. government in violation of the FCA.

## COUNT I: FEDERAL FALSE CLAIMS ACT

The allegations in the preceding paragraphs are incorporated by reference.

198.     This is a civil qui tam action by Relator, acting on behalf of and in the name of the

26

Government, against all Defendants.

199.  Each of the Defendants violated the False Claims Act, 31 U.S.C. § 3729 *et seq*., in that they:

   a.  knowingly presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval.

   b.  knowingly made, used, or caused to be made or used:

      (i) false records or statements material to false or fraudulent claims, or to get false or fraudulent claims paid or approved; or

      (ii) a false record or statement material to a false or fraudulent claim; and

   c.  conspired to commit the above acts and to defraud the Government by getting false or fraudulent claims allowed or paid.

200.  Pursuant to 31 U.S.C. § 3729 *et seq*., any person who violates the provisions set forth herein, is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains as a result of Defendants' making of false claims as herein above set forth.

201.  Upon information and belief, the Government has paid Defendants' false claims in full.

202.  Defendants have filed or caused to be filed false claims as described above, and it is alleged that their conduct began before Relator's first observation of their conduct, and continues through the present.

203.  As a direct, foreseeable, and proximate result of Defendants' conduct in violation of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

204.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

27

jury trial.

**WHEREFORE**, Plaintiff requests that the Court enter an award in favor of Plaintiff and against all Defendants for all sums authorized under and pursuant to 31 U.S.C. 3729(a).


Respectfully Submitted,


_Michael Hamilton_
Michael Hamilton
Tennessee Bar 10720
Provost & Umphrey, LLP
2021 Richard Jones Rd., Suite 300
Nashville, Tennessee 37215
615 242-0199
615 256-5922 (fax)
mhamilton@pulf.com

Jonathan Kroner
Florida Bar 328677
Jonathan Kroner Law Office
420 Lincoln Rd., Suite 248
Miami Beach, FL 33139
305.310.6046
305.455.9570 (fax)
JK@FloridaFalseClaim.com

*Attorneys for Plaintiff-Relator*

28